In re NATURAL GAS ROYALTIES
Qui Tam Litigation,

Jack J. Grynberg, ex rel. United
States, Plaintiff–Appellant,

v.

Pacific Gas and Electric Company;
Pacific Gas Transmission Company,
n/k/a Gas Transmission Northwest
Corporation; KN Energy, Inc.;
Rocky Mountain Natural Gas Company; TCP Gathering Co.; KN Interstate Gas Transmission Co.; KN
Natural Gas, Inc.; Northern Gas
Company; Westar Transmission
Company; Wildhorse Energy Partners, L.L.C.; Questar Pipeline Company; Wexpro Company; Questar
Gas Management Co.; Questar
Corp.; Questar Gas Co.; Universal
Resources Corporation; Coastal
States Gas Transmission Company;
Colorado Interstate Gas Company;
Coastal Corporation; Coastal Oil &
Gas Corp.; Coastal Gas Services
Company; Coastal Gas Marketing
Company; Coastal Field Services
Company; Great Divide Gas Services, LLC; Daughin Island Gathering Partners; Coastal Chem, Inc.;
Greeley Gas Company; Enron Corporation; Black Marlin Pipeline Co.;
Enron Oil & Gas Company; Louisiana Resources Company; Northern
Border Pipeline Co.; Northern Natural Gas Company; Northern Natural
Gas Production Company; Transwestern Pipeline Company; Enron
Gas Marketing, Inc.; El Paso Natural Gas Company; Tennessee Gas
Pipeline Company; East Tennessee
Natural Gas Company; El Paso Energy Marketing Company; El Paso
Field Services Company; Cornerstone Natural Gas, Inc.; El Paso
Gas Marketing Company; El Paso
Tennessee Pipeline Co.; Premier Gas
Company; TransColorado Gas Transmission Company; PanEnergy Corp.;
Daughin Island Gathering Company
LP; Pan Gas Storage Co.; Panhandle Eastern Pipe Line Company;
Texas Eastern Transmission LP;
Trunkline Gas Company; Utilicorp
United, Inc.; Aquila Energy Corporation; Aquila Gas Pipeline Corporation; Utilicorp Pipeline Systems,
Inc.; Utilicorp Energy Solutions,
Inc.; Tristar Gas Investments Corp.;
Public Service Company of Colorado;
MGTC, Inc.; MIGC, Inc.; Kern River Gas Transmission Company;
Northwest Pipeline Corporation;
Williams Companies, Inc.; Williams
Interstate Natural Gas Systems;
Texas Gas Transmission Corp.;
TransContinental Gas Pipeline Corp.;
TransContinental Gas Supply;
TransContinental Oil Corporation;
Williams Field Services Company;
Williams Gas Marketing; Williams
Gas Supply; Williams Production;
Southern Natural Gas Company;
Sea Robin Pipeline Company; Florida Gas Transmission Company; Sonat, Inc.; Sonat Exploration Compa-

ny; Sonat Energy Services; Sonat Marketing Company, L.P.; Citrus Corp.; Bear Creek Storage Company; Coral Energy, L.P.; Evangeline Gas Pipeline Company LP; Evangeline Gas Corporation; Tejas Gas, LLC; Tejas Gas Operating, LLC; Acadian Gas LLC; Tejas Natural Gas, LLC; Transok, LLC; Gulf Coast Natural Gas Company; Tejas–Magnolia Energy, LLC; Gulf Energy Pipeline, LLC; Consolidated Natural Gas Company; CNG Transmission Corporation; CNG Producing Company; East Ohio Gas Company; CNG Energy Services Corporation; Columbia Gulf Transmission Company; Columbia Gas System, Inc.; Columbia Gas System Service Corporation; Columbia LNG Corporation; Columbia Gas Transmission Corporation; Columbia Natural Resources, Inc.; Columbia Energy Services Corporation; Columbia Gas of Kentucky, Inc.; Columbia Gas of Ohio, Inc.; Columbia Gas of Maryland, Inc.; Columbia Gas of Pennsylvania, Inc.; Commonwealth Gas Services, Inc.; Aviara Energy Corporation; Louisiana Intrastate Gas Company, LLC; Equitable Resources, Inc.; Equitrans, LP; Jefferson Island Storage & Hub LLC; Dynegy, Inc.; Venice Energy Services Company, L.L.C.; Continental Natural Gas, Inc.; Continental Gas Gathering, LLC; Continental Gas Processing, L.L.C.; LG & E Natural Mktg; LG & E Natural Gathering and Processing Co.; LG & E Natural Pipeline Co.; Transok, Inc., predecessor to Transok LLC, k/n/a Enogex Inc.; Enogex, Inc.; Enogex Services Corporation, k/n/a OGE Energy Resources, Inc.; Oklahoma Gas & Electric Company; Caddo Gas Gathering Company; Woodward Pipeline, Inc.; Noram USA, Inc.; Noram Energy Corporation; Norman Gas Transmission Company,; Noram Energy Services, Inc.; Noram Field Services Corp.; Mississippi River Transmission Corporation; Arkansas Louisiana Gas Company; Arkla, Inc.; Arkla Energy Resources; Minnegasco and Louisiana Intrastate Gas Corporation; Delhi Gas Pipeline Corporation; Marathon Oil Company; Marathon Pipe Line Company; Blue Dolphin Pipe Line Company; Montana Power Company; FMC Corporation; FMC Wyoming Corporation; Burlington Resources Oil & Gas Company; Burlington Resources, Inc.; Burlington Resources Trading, Inc.; Louisiana Land and Exploration Company; Inexco Oil Company; Inexco Gas Transmission Company; Snyder Oil Corporation; Snyder Gas Marketing, Inc.; Soco Offshore, Inc.; Conoco, Inc.; Louisiana Gas Systems, Inc., Bargath, Inc.; Williams Production RMT Company; Transmontaigne Oil Company; Southwestern Energy Company; Southwestern Energy Production Company; Southwestern Energy Services Company; Southwestern Energy Pipeline Company; Arkansas Western Gas Company; Associated Natural Gas Company; Arkansas Western Pipeline Company; Seeco, Inc.; Dow Chemical Company; Dow Chemical USA; ANR Pipeline Company; ANR Production Company; ANR Storage Company; High Island Offshore System; U–T Offshore System; Blue Lake Gas Storage Company; Consumers Energy; Consumers Power; Michigan Gas Storage Company; CMS Enterprises Company; CMS Gas Transmission and Storage Company; CMS Gas Co.; CMS Gas Marketing; CMS Nomeco

Oil & Gas Co.; Terra Energy Ltd.; Agave Energy Co.; Phillips Pipe Line Company; Apache Corporation; Mobil Natural Gas, Inc.; Superior Oil Company; Mobil Exploration & Producing U.S., Inc.; Exxon Company, USA; Shell Oil Company; Shell Offshore, Inc.; Shell Pipeline Corporation; Atlantic Richfield Company; Vastar Resources, Inc.; Arco Oil and Gas Company; Vastar Gas Marketing, Inc.; Arco Pipe Line Company; Arco Permian, dba Atlantic Richfield Company; Natural Gas Pipeline Company of America; Stingray Pipeline Company; Occidental Oil and Gas Corporation; Midcon Corp.; Midcon Gas Services Corp.; Occidental Energy Ventures Corp.; Midcon Texas Pipeline Operator, Inc.; Placid Oil Company; Oxy USA Inc.; Midcon Marketing Corp.; Cross Timbers Oil Company, k/n/a XTO Energy Inc.; Cross Timbers Operating Company; Cross Timbers Energy Services, Inc.; Ringwood Gathering Company; Timberland Gathering & Processing Company; Cove Point Lng Limited Partnership; Entex, Inc.; CMS Natural Gas Gathering, LLC; Shell Land & Energy Company; Shell Western E & P Inc.; Southern Star Central Gas Pipeline, Inc., f/k/a Williams Natural Gas Company; Hunt Petroleum Corporation; Atmos Energy Corporation, dba Greeley Gas Company; DCP Midstream, LP; Duke Energy Services, Inc.; Barrett Resources Corporation; Plains Petroleum Company; Citrus Interstate Pipeline Company, n/k/a Citrus Energy Services, Inc.; Equitable Storage Company, n/k/a Jefferson Island Storage & Hub LLC; Pontchartrain Natural Gas System, assignee of Louisiana Industrial Gas Supply Systems, Defendants–Appellees.

Nos. 06–8099, 06–8101, 06–8102, 06–8103, 06–8104, 06–8105, 06–8106, 06–8107, 06–8108, 06–8110, 06–8111, 06–8112, 06–8120, 06–8121, 06–8123, 06–8124, 06–8125, 06–8127, 06–8129, 06–8130, 06–8131, 06–8132, 06–8133, 06–8135, 06–8136, 06–8141, 06–8145, 06–8147, 06–8149, 06–8151, 06–8157, 06–8159, 06–8160, 06–8161, 06–8164, 06–8166, 06–8168, 06–8170, 06–8171, 06–8172, 06–8173, 06–8174, 06–8176, 06–8177, 06–8178.

United States Court of Appeals, Tenth Circuit.

March 17, 2009.

Jeffrey A. Chase (Elizabeth L. Harris with him on the briefs), Jacobs Chase Frick Kleinkopf & Kelley, LLC, Denver, CO, for Relator–Appellant.

L. Poe Leggette, Fulbright & Jaworski, LLP, Washington, D.C. (Donald I. Shultz, Holland & Hart LLP, Cheyenne, WY, and

Nancy L. Pell and Laura S. Morton, Fulbright & Jaworski, LLP, Washington, D.C., with him on the brief), and Michael L. Beatty (Rebecca H. Noecker with him on the brief), Beatty & Wozniak, PC, Denver, CO, for Coordinated Defendants–Appellees.

Michael L. Beatty and Rebecca H. Noecker, Beatty & Wozniak, PC, Denver, CO, for Defendants–Appellees KN Energy, et al.

Elizabeth A. Phelan, Holland & Hart, LLP, Boulder, CO, and Donald I. Shultz, Holland & Hart, LLP, Cheyenne, WY, for Defendants–Appellees Questar Corporation, et al.

Charles D. Tetrault, Vinson & Elkins, LLP, Washington, D.C., for Defendant–Appellee Transwestern Pipeline Company, LLC.

Michael L. Beatty and Rebecca H. Noecker, Beatty & Wozniak, PC, Denver, CO, for Defendant–Appellee TransColorado Gas Transmission Company.

Kevin D. Evans, Steese & Evans, PC, Denver, CO, for Defendant–Appellee Public Service Company of Colorado.

Robin F. Fields and Charles B. Williams, Connor & Winters LLP, Oklahoma City, OK, for Defendants–Appellees Enogex, OG & E, and Cross Timbers.

Lawrence G. McBride, Foley & Lardner, LLP, Washington, D.C., for Defendant–Appellee Blue Dolphin Pipe Line Company.

Michael L. Beatty and Rebecca H. Noecker, Beatty & Wozniak, PC, Denver, CO, for Defendant–Appellee Apache Corporation.

Robert Salcido, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C., and Daniel M. McClure and Laura S. Morton, Fulbright & Jaworski LLP, Houston, TX, for Defendants–Appellees Shell, Mobil, and Exxon.

Before MURPHY, McKAY, and McCONNELL, Circuit Judges.

McKAY, Circuit Judge.

In these consolidated appeals, Relator–Appellant Jack Grynberg appeals the district court's dismissal of a large number of coordinated *qui tam* cases Relator had brought against numerous natural gas pipelines and other companies involved in measuring natural gas produced from federal or Indian lands.[1] The district court dismissed the cases for lack of subject matter jurisdiction under 31 U.S.C. § 3730(e)(4), holding that Relator's complaints were based upon publicly disclosed allegations and that Relator was not an original source of the information upon which the allegations in his complaints were based. We affirm.

## BACKGROUND

Beginning in June of 1997, Relator filed a series of seventy-three lawsuits under the *qui tam* provisions of the False Claims Act against a large number of natural gas pipeline companies and their various parents, subsidiaries, and affiliates, accusing them of underpaying royalties to the government in violation of 31 U.S.C. § 3729(a)(7). Each complaint accused the Defendants named therein of utilizing several identified mismeasurement techniques

---

1. Of the seventy-three related appeals originally filed and consolidated by this court, appellant voluntarily dismissed twenty-nine of those appeals during the course of appellate proceedings. The dismissed appeals were: 06–8100, 06–8109, 06–8113, 06–8114, 06– 8115, 06–8116, 06–8117, 06–8118, 06–8119, 06–8128, 06–8134, 06–8137, 06–8138, 06–8139, 06–8140, 06–8142, 06–8143, 06–8144, 06–8146, 06–8150, 06–8152, 06–8153, 06–8154, 06–8155, 06–8162, 06–8163, 06–8167, 06–8169, 06–8175.

to knowingly underreport or cause others to underreport the heating content and volume of gas, with a resultant underpayment of federal royalties. Most of the alleged mismeasurement techniques were common to all seventy-three cases.

█ The cases were transferred as multidistrict litigation to the District of Wyoming, where Defendants filed motions to dismiss for lack of subject matter jurisdiction. Under the direction of a special master, the parties conducted limited discovery on this issue. Because the special master and district court considered evidentiary materials and because the jurisdictional question was intertwined with the merits, the special master and district court properly treated Defendants' motions to dismiss as motions for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure. *See United States ex rel. Hafter v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1159 (10th Cir.1999).

In his report and recommendations, the special master concluded that forty of the seventy-three cases should be dismissed under § 3730(e)(4) because the allegations in these cases had been publicly disclosed and Relator was not an original source of the information upon which the allegations were based. The special master concluded that the remaining thirty-three cases were not jurisdictionally barred because none of the Defendants in these cases were identified in any public disclosure alleging mismeasurement of natural gas. The district court adopted in part and modified in part the special master's report, holding that all of the cases were barred under § 3730(e)(4) because the publicly disclosed allegations of widespread mismeasurement were sufficient to set the government on

the trail of the fraud as to all Defendants and Relator did not fit within the original source exception to the public disclosure bar. The court therefore entered judgment in favor of Defendants in each of the seventy three cases.[2]

█ On appeal, Relator challenges the district court's conclusions that the public disclosure bar was triggered as to all Defendants and that Relator was not an original source of the information upon which the allegations were based. We review these issues of subject matter jurisdiction de novo, employing the same legal standard as the district court. *See United States ex rel. Grynberg v. Praxair, Inc.,* 389 F.3d 1038, 1047 (10th Cir.2004).

## DISCUSSION

█ The False Claims Act imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7). The FCA's *qui tam* provisions allow a private individual, known as a relator, to bring a civil action on behalf of the government against such persons and to share in any resulting government recovery. *See Kennard v. Comstock Res., Inc.,* 363 F.3d 1039, 1041 (10th Cir.2004) (citing 31 U.S.C. § 3730(b)(1) and (d)). "The purpose of the FCA 'is to enhance the Government's ability to recover losses sustained as a result of fraud against the Government.' " *Praxair,* 389 F.3d at 1041 (quoting S.Rep. No. 99–345, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266). To further that purpose, Congress has sought through the *qui tam* provisions to achieve " 'the golden

---

**2.** In seven cases, judgment was entered pursuant to Fed.R.Civ.P. 54(b) because the district court's order did not dispose of all claims. The subsequent dismissal of these remaining claims was separately appealed and is not addressed in this opinion.

mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own.'" *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir.1995) (quoting *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 649 (D.C.Cir.1994)). Accordingly, a relator's action will be jurisdictionally barred if it is based on allegations or transactions already in the public domain unless the relator can show that he is an "original source" of the information on which the allegations are based. 31 U.S.C. § 3730(e)(4)(A). "If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence." *Hafter*, 190 F.3d at 1160.

■ To determine whether the FCA's public disclosure bar has been triggered, we consider "(1) whether the alleged 'public disclosure' contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made 'public' within the meaning of the FCA; [and] (3) whether the relator's complaint is 'based upon' this 'public disclosure.'" *United States ex rel. Holmes v. Consumer Ins. Group*, 318 F.3d 1199, 1203 (10th Cir.2003). If each of these three questions is answered in the affirmative, the public disclosure bar is triggered and the relator must demonstrate original source status in order to proceed with his *qui tam* action. *United States ex rel. Fine v. Advanced Scis., Inc.*, 99 F.3d 1000, 1004 (10th Cir.1996).

*Public Disclosure*

The district court concluded that the public disclosure bar had been triggered as to all Defendants based upon two main sets of documents: (1) several documents related to an investigation conducted in the 1980s by the United States Senate Select Committee on Indian Affairs and (2) court documents from and newspaper reports describing a *qui tam* action Relator had filed in 1995 against forty-four natural gas pipeline companies in the District of Columbia, which the court dismissed in March 1997 for failure to plead fraud with specificity and improper joinder of parties. The Senate Committee documents disclosed the mismeasurement of oil and gas on a large scale but did not identify any specific companies that engaged gas mismeasurement, while the defendants named in the 1995 *qui tam* action overlapped with Defendants or affiliates of Defendants in approximately half of the seventy-three 1997 complaints. Rejecting the special master's conclusion that the public disclosure bar was only triggered by public disclosures that specifically named Defendants or affiliates of Defendants, the district court concluded that the Senate Committee documents and the 1995 action had triggered the public disclosure bar as to all Defendants because these documents alerted the government to the industry-wide nature of the fraud and enabled the government to readily identify wrongdoers through an investigation of the companies measuring gas produced from federal or Indian lands.

■ On appeal, Relator does not dispute that the 1995 action and Senate Committee documents were publicly disclosed and were from sources listed in § 3730(e)(4)(A).[3] Rather, he disputes the

---

3. Relator asserts in a footnote that a relator's own prior *qui tam* action should not trigger the public disclosure bar against him. Relator has not properly raised this issue on ap-

peal. *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir.2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."). Moreover, we see no

applicability of the third prong of the public disclosure test to his complaints. This prong of the analysis asks whether the *qui tam* complaint was "based upon," meaning "supported by," the publicly disclosed allegations or transactions. *See United States ex rel. Fine v. MK–Ferguson Co.,* 99 F.3d 1538, 1545 (10th Cir.1996). "The test is whether 'substantial identity' exists between the publicly disclosed allegations and the *qui tam* complaint." *Id.* Relator argues that this prong was not satisfied as to at least some Defendants and some mismeasurement techniques because these Defendants and techniques were not identified in any public disclosed allegation.

■■■ As an initial matter, we address Relator's argument that each alleged mismeasurement technique was a separate and unique claim of fraud that should not be barred unless specifically alleged in a public disclosure. Relator correctly points out that we use a claim-by-claim analysis to determine whether the allegations in a complaint were publicly disclosed. *See, e.g., id.* at 1547; *see also United States ex rel. Boothe v. Sun Healthcare Group, Inc.,* 496 F.3d 1169, 1177 (10th Cir.2007) (holding that "courts must analyze the jurisdictional status of each reasonably discrete claim of fraud in a *qui tam* action"). After reviewing the *qui tam* complaints at issue here, however, we agree with the district court that the alleged mismeasurement techniques are not separate claims of fraud but are rather interrelated parts of the alleged fraud of deliberately mismeasuring natural gas volume and misanalyzing gas heating content in order to underpay royalties to the United States. We conclude that the district court correctly considered whether there was substantial identity between the complaints and the publicly disclosed documents based on the overall fraudulent mismeasurement scheme rather

than each mismeasurement technique allegedly employed in the scheme. We further agree with the district court that the fraudulent scheme alleged in the 1997 complaints shares substantial identity with the allegations publicly disclosed in the Senate Committee documents and 1995 lawsuit. *See MK–Ferguson,* 99 F.3d at 1546–47 (holding that inclusion of additional details in *qui tam* complaint does not prevent application of public disclosure bar); *see also Praxair,* 389 F.3d at 1051 (holding that *qui tam* actions only partially based upon publicly disclosed allegations or transactions may still be barred).

The next question we must address is whether the public disclosures of natural gas mismeasurement by other industry members and in the industry as a whole were sufficient to trigger the public disclosure bar as to Defendants not named in these disclosures. A handful of relevant cases provide us with guidance on this issue.

The first circuit to squarely address this issue was the Eleventh Circuit in *Cooper v. Blue Cross & Blue Shield of Florida, Inc.,* 19 F.3d 562 (11th Cir.1994). In *Cooper,* a relator sued Blue Cross Blue Shield of Florida for incorrectly instructing him that Medicare and not BCBSF should pay on his claims first, thus causing Medicare to make payments that should have been covered by BCBSF as his primary insurer. The Eleventh Circuit rejected the district court's conclusion that the relator's allegations had been publicly disclosed in several sources, including a General Accounting Office report describing widespread Medicare secondary payer fraud throughout the insurance industry, newspaper accounts publicizing similar wrongful practices committed by other insurance companies, and a prior *qui tam* action against Blue Cross

basis in the statute or our case law for such an exception.

Blue Shield of Georgia alleging the same type of conduct. Stating that it was "crucial whether [the defendant] was mentioned by name or otherwise specifically identified in public disclosures," the Eleventh Circuit held that "[r]equiring that allegations specific to a particular defendant be publically disclosed before finding the action potentially barred" implemented the goals of the statute by "encourag[ing] private citizen involvement and increas[ing] the chances that every instance of specific fraud will be revealed." *Id.* at 566.

We distinguished *Cooper* in *United States ex rel. Fine v. Sandia Corp.,* 70 F.3d 568 (10th Cir.1995). In *Sandia,* the relator sued Sandia Corporation under the FCA for misappropriating nuclear waste funds. A prior General Accounting Office report and a congressional hearing had disclosed that contractors operating at two of the Department of Energy's nine multi-program laboratories were engaging in this practice. Although Sandia was not named in these public disclosures, we held that the public disclosure bar had been triggered as to Sandia because the report and hearing "set the government squarely on the trail of the alleged fraud without [the relator's] assistance." *Id.* at 571. Because these disclosures "detailed the mechanics of the practice, revealed that at least two of Sandia's eight sister laboratories were engaged in it, and indicated the DOE's acquiescence," we concluded that "they sufficiently alerted the government to the likelihood" that Sandia would also engage in the practice. *Id.* at 571. We held that *Cooper* was distinguishable because, "[w]hen attempting to identify individual actors, little similarity exists between combing through the private insurance industry in search of fraud and examining the operating procedures of nine, easily identifiable, DOE-controlled, and government-owned laborato-

ries." *Id.* at 572. In light of "Congress' twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own," we concluded that it would be contrary to the purposes of the FCA to exercise jurisdiction over the relator's claim in this case. *Id.* at 571 (internal quotation marks omitted).

Other circuits have followed the *Sandia* reasoning and similarly distinguished *Cooper* where the public disclosures at issue are sufficient to set the government squarely upon the trail of the alleged fraud. For instance, in *United States v. Alcan Electrical and Engineering, Inc.,* 197 F.3d 1014, 1019 (9th Cir.1999), the Ninth Circuit held that a *qui tam* action making identical allegations to a prior lawsuit was barred by the public disclosure bar because, although only one of the defendants had been named in the prior lawsuit, the *qui tam* defendants were all part of a "narrow class of suspected wrongdoers—local electrical contractors who worked on federally funded projects over a four-year period" and filed weekly payrolls with the government during this period. The Ninth Circuit held that "the instant case is similar to *Sandia,* in that the government, as regulator and owner, presumably would have ready access to documents identifying those contractors. This ready access makes it highly likely that the government could easily identify the contractors at issue." *Id.*

Likewise, in *United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675 (D.C.Cir.1997), the D.C. Circuit held that publicly disclosed allegations that federal employees' clubs inappropriately retained revenue from vending services on federal property triggered the public disclosure bar as to the relator's *qui tam* action against employees' clubs of the Bu-

reau of Prisons. Noting that the public disclosures at issue disclosed that the practice occurred throughout the federal government, identified the nature of the fraud, and identified the types of actors engaged in the allegedly fraudulent activity, the court concluded that the relator's allegations "substantially repeat what the public already knows and add only the identity of particular employees' clubs engaged in the questionable and previously documented generic practice." *Id.* at 687. The court rejected the relator's argument that the public disclosures at issue were similar to a generic disclosure of fraud by defense contractors, stating that "[l]ittle similarity exists between combing through the myriad of transactions performed by the various defense contractors in search of fraud and finding easily identifiable federal employee organizations that provide vending services on federal property." *Id.*

■ Applying the reasoning from these cases to the facts before us, we hold that the Senate Committee documents and 1995 *qui tam* action publicly disclosed the allegations against all Defendants named in Relator's 1997 complaints. We note that, as in *Sandia*, the public disclosures at issue named a significant percentage of industry participants as wrongdoers and indicated that others in the industry were very likely engaged in the same practices.[4] The 1995 action alleged mismeasurement by natural gas pipeline companies in general and did not suggest that the alleged practices were limited to the named defendants. Indeed, the complaint indicated that further investigation might lead to knowledge of more mismeasurement techniques and participation in this type of activity by other companies. Newspaper reports regarding this action also disclosed

the industrywide nature of this action's broad allegations.

As in *Findley, Alcan,* and *Sandia,* the public disclosures provided specific details about the fraudulent scheme and the types of actors involved in it, removing this from a situation where the government would need to comb through myriad transactions performed by various types of entities in search of potential fraud. A general allegation of Medicare fraud—or even more a specific allegation of Medicare fraud through the practice of incorrectly informing patients or healthcare providers that claims should be submitted first to Medicare and not the primary insurer—does not help the government know where to focus in an investigation of the countless individual Medicare claims submitted to the government by vast numbers of health care providers and individuals. By contrast, the specific allegation that measurers of natural gas on federal and tribal lands engage in identified techniques to mismeasure gas obtained from federal or tribal properties allows the government to target its investigation toward specific actors and a specific type of fraudulent activity.

The government's ability to investigate the potential fraud in this case is also furthered by the information in its records and its control over the locations at which the fraud is allegedly occurring. The government knows and has contracts with the royalty payors who either measure or rely on purchasers' measurements of gas produced from federal land. Although the royalty payors may not always measure the gas themselves, the government should be able to discover from these royalty payors the source of the measurements upon which they are basing their royalty payments. Moreover, the measuring facil-

---

**4.** In fact, the percentage of industry participants named in the public disclosures is, according to Relator's own figures, exactly the same as the percentage named in *Sandia*.

ities at which the alleged fraud is occurring are located at government-controlled facilities on federally or tribally owned lands and are subject to physical inspection by the government.[5] Thus, an investigation into the publicly disclosed allegations at issue here is not analogous to poring over millions of individual Medicare claims looking for specific instances of fraud by insurers, health-care providers, and other potential wrongdoers.

We therefore conclude that the allegations of industrywide gas mismeasurement disclosed in the 1995 complaint and the Senate Committee documents were sufficient to set the government on the trail of the fraud as to all Defendants and thus that the allegations in Relator's 1997 complaints were publicly disclosed.[6] Because the public disclosure bar has been triggered, all the instant cases will be barred for lack of subject matter jurisdiction unless Relator can demonstrate original source status. Accordingly, we turn to the question of whether Relator fits within the original source exception to the public disclosure bar.

*Original Source*

The FCA defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). We first consider how the second part of this definition, the pre-filing disclosure requirement, affects our analysis of the first part, then consider whether Relator has demonstrat-

ed that he had direct and independent knowledge of the information underlying his allegations.

In *United States ex rel. King v. Hillcrest Health Center, Inc.,* 264 F.3d 1271, 1280 (10th Cir.2001), we discussed the pre-filing disclosure requirement of the original source definition. We noted that "courts have not settled on what it means to have 'voluntarily provided the information to the Government before filing an action.'" *Id.* (quoting § 3730(e)(4)(B)). We also noted that this pre-filing disclosure requirement is distinct from the written disclosure requirement of § 3730(b)(2) and requires the relator to "voluntarily provide the Government with the essential elements or information on which the *qui tam* allegations are based" before filing the *qui tam* action. *Id.* We stated: "The pre-filing voluntary disclosure requirement encourages private individuals to come forward with their information of fraud 'at the earliest possible time and ... discourage[s] persons with relevant information from remaining silent.'" *Id.* at 1280–81 (alterations in original) (quoting *United States v. Bank of Farmington,* 166 F.3d 853, 866 (7th Cir.1999)). Additionally, we noted, "this requirement also gives the government the chance to consider whether there has already been public disclosure of the matters, whether the prospective relator in fact possesses direct and independent knowledge of the matters he is disclosing, and whether he is making disclosures on a voluntary basis." *Id.* at 1281 (internal quotation marks omitted). We then held that a relator could not qualify as an original source if he had withheld essential elements of the fraud transaction

---

**5.** Although Relator argues that the district court impermissibly resolved disputed issues of material fact in Defendants' favor, he cites to no evidence in the record calling these facts recited by the district court into dispute.

**6.** Because we conclude that these documents publicly disclosed the allegations of all the instant complaints, we need not consider whether any other documents could also constitute public disclosures of the allegations.

from his pre-filing disclosure and thus "deprive[d] the government of key facts necessary in its efforts to confirm, substantiate or evaluate the fraud allegations." *Id.*

■ Based mainly on *Hillcrest*, the district court held that the "direct and independent knowledge" element of the original source test must be satisfied with information the relator voluntarily disclosed to the government before filing and that no other information can be considered in the original source assessment. Although we agree with Relator that this result was not directly compelled by *Hillcrest*, we conclude that the district court's holding was a sensible interpretation of the statute in light of the purposes of the FCA.

As noted above, the FCA's *qui tam* provisions are intended to achieve " 'the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own.' " *Sandia*, 70 F.3d at 571 (quoting *Springfield*, 14 F.3d at 649). As an incentive for individuals with genuinely valuable information to come forward with that information, the original source statute provides an exception to the public disclosure bar for a relator who voluntarily provides the government with information about which he has direct and independent knowledge before filing the *qui tam* action. If a relator does not voluntarily provide such information to the government, however, the purposes of the FCA weigh against allowing him to bring a *qui tam* action and share in any resulting government recovery, at least where the government has already been alerted to the fraud by a public disclosure. "[I]t is our task to

ensure that '*qui tam* suits are limited to those in which the relator *has contributed significant independent information.*' " *Findley*, 105 F.3d at 686 (quoting *Springfield*, 14 F.3d at 653) (emphasis added).

As we held in *Hillcrest*, it is appropriate to apply the statute's jurisdictional requirements in a manner that "encourages private individuals to come forward quickly with their information, to not dawdle when there has been a public disclosure, and to discourage persons from withholding or remaining silent about their relevant information." 264 F.3d at 1281. Permitting a relator to satisfy the pre-filing disclosure requirement by providing the government with a minimal amount of information regarding the fraud, while other information about which the relator has direct and independent information is withheld from the government until trial, would hamper the government's ability to investigate the fraud and would provide no incentive for individuals to come forward quickly with all relevant information in their possession. We agree with the special master that, "if a relator does not deem information important enough to voluntarily disclose it to the government before filing suit, he should not be allowed to later rely upon it to establish his status as an original source." (Report and Recommendations at 102–03.) We thus hold that our assessment of Relator's knowledge in this case is limited to information he voluntarily provided to the government before filing suit.

■ Accordingly, we now consider whether the information Relator provided to the government shows that he had "direct and independent knowledge" of the information underlying the allegations in any of his 1997 *qui tam* complaints.[7]

---

7. As stated above, we reject Relator's argument that each individual mismeasurement technique constituted a separate allegation of fraud. Relator chose to plead the mismeasurement techniques as interrelated parts of his broad claim of fraud in Defendants' meas-

Knowledge is "direct and independent" if it is "marked by [the] absence of an intervening agency" and "unmediated by anything but [the relator's] own efforts." *MK–Ferguson*, 99 F.3d at 1547 (alterations in original) (internal quotation marks omitted). "To establish original source status knowledge, a *qui tam* plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof." *Hafter*, 190 F.3d at 1162. Secondhand information, speculation, background information, or collateral research do not satisfy a relator's burden of establishing the requisite knowledge. *Id.* at 1162–63. "A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed." *Findley*, 105 F.3d at 688. The fact that a relator has background information or unique expertise allowing him to understand the significance of publicly disclosed allegations and transactions is also insufficient. *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir.1991).

 Relator bears the burden of alleging the facts essential to show jurisdiction and supporting those facts with competent proof. *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 551 (10th Cir.1992). The district court concluded that there was insufficient evidence in the record to support consideration of

either Relator's oral communications with government employees or documents that may have been copied by government representatives during their reviews of Relator's files. We agree. Thus, like the district court, we will limit our assessment of Relator's knowledge to the two sets of disclosure documents he provided to the government before filing suit.[8]

 Relator provided the government with no information regarding any named Defendant in several of the 1997 *qui tam* cases. He contends that his experience in the industry, his hypotheses regarding the accuracy of certain measurement techniques, and his interviews with third parties such as manufacturers of measuring devices and government representatives are sufficient to show direct and independent knowledge that all members of the industry were engaging in the alleged fraudulent practices. We disagree and hold that, in those cases where Relator did not even provide the names of any Defendants to the government, he cannot qualify as an original source as to the allegations in those complaints.

In several other cases, Relator provided the government only with pages of handwritten notes briefly mentioning telephonic or attempted telephonic interviews with employees of various Defendants. For certain Defendants, the notes indicated that Relator or his staff confirmed through these interviews that Defendants used one or two specific measurement practices that were the subject of the *qui tam* complaints, such as measuring gas downstream of the orifice plate. We conclude that this secondhand knowledge from em-

---

urement of gas. Therefore, like the district court, we consider for each case whether Relator demonstrated original source status as to the broad mismeasurement claim as a whole, not as to each fact alleged in support of this claim.

8. We agree with the special master that, to the extent there is a dispute of fact regarding whether Relator provided these documents to the government before filing suit, it must be resolved in favor of Relator for purposes of summary judgment.

ployees of various Defendants does not constitute "direct and independent" knowledge, and thus that Relator is not an original source as to these Defendants.

A few other Defendants were briefly mentioned in one or two documents besides the phone call notes, but the references to these Defendants were innocuous, irrelevant to the allegations in Relator's complaints, or based upon speculation, publicly available documents, and secondhand information. We thus hold that Relator did not demonstrate "direct and independent" knowledge as to these Defendants.

The special master identified three cases in which Relator's claim of original source status was strongest because, taken in the light most favorable to him, the information he provided to the government demonstrated that he had a limited amount of direct and independent knowledge about a handful (though far from a majority) of the mismeasurement techniques these defendants allegedly employed. As the special master noted, these three cases thus raised the issue of just how much direct and independent information a relator must have in order for his allegations to be "based" upon this information in accordance with the statutory mandate. *See* § 3730(e)(4)(B). The special master considered four possible approaches to make this assessment and concluded that an "all or nothing approach" requiring direct and independent knowledge of every alleged fact in the complaint would be too restrictive, while a "bare minimum" approach would err in the opposite extreme. The third approach suggested by the special master, a "pick and choose" approach, would limit the relator to claims based on allegations for which he had direct and independent knowledge, while the rest would be dismissed. However, as the special master noted, this approach would re-

quire the district court to effectively redraft relators' complaints. Moreover, this approach also suffers from the "all-or-nothing" approach's draconian rejection of individual claims based even in small part on publicly disclosed information. Thus, the special master concluded that the best approach would be the fourth suggested approach, a "substantiality" standard. Under this standard, the district court would evaluate the relator's independently discovered information against the entirety of the allegations on which he based his claim and sustain the relator's invocation of subject matter jurisdiction only if his contribution in terms of direct and independent knowledge was substantial.

We agree with the special master that "substantiality" is the best approach to assess whether a relator's direct and independent information is sufficient to qualify him as an original source. This standard provides a balance between "the dual goals of 'avoidance of parasitism and encouragement of legitimate citizen enforcement actions.'" *Kennard,* 363 F.3d at 1041 (quoting *Springfield,* 14 F.3d at 651). The substantiality standard's emphasis on the relative value of the relator's direct and independent knowledge when compared with the rest of the complaint encourages the relator not to overreach by tacking reams of publicly disclosed information onto his complaint. However, the standard still allows the realtor to supplement his direct knowledge with some information derived from innocuous public sources, thus avoiding the pitfalls inherent in the "all or nothing" and "pick and choose" approaches. Applying this standard to the facts before us, we conclude that Relator's limited direct and independent information as to each of these Defendants is minimal in comparison to the broad scope of his allegations against them and thus fails to meet the substantiality standard. We therefore hold that

Relator lacks sufficient direct and independent knowledge to qualify as an original source as to these Defendants.

We conclude that Relator did not provide the government with information demonstrating sufficient direct and independent knowledge to qualify as an original source as to any Defendants. Because we affirm the district court's dismissal of the complaints on this ground, we do not address Defendants' additional arguments regarding Relator's status as an original source. We likewise do not address Defendants' alternate argument for dismissal based on the written disclosure requirement of 31 U.S.C. § 3730(b)(2).

### CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Relator's *qui tam* complaints. We **DENY** Relator's motion to remand based on supervening law.